The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may draw near and give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced. The times will be as allotted to counsel. The first case today is United States v. Ivan Cruz-Rivera, appeal number 191465 and United States v. Carlos Jimenez, appeal number 191509. Good morning, counsel. Judge Thompson and I would like to welcome Judge Katzmann for joining us and helping us out. It's always nice to see you, Judge Katzmann. And Ms. Freed, you may begin when you are ready. Thank you very much, Your Honor. This is Attorney Siri Freed. May it please the Court, representing Ivan Cruz-Rivera in this matter. With the Court's leave, I would request two minutes for rebuttal. Yes. Thank you very much. I'd like to start first by addressing our allegation, our argument that there was misconduct in the closing argument. The other matters I hope to cover in my time include the question about whether or not my client was in turning to the restriction on cross-examination. I'd like to begin, though, by talking about the misconduct by emphasizing first that this was a very weak case. We would contend that this was, although we're not arguing that the case was legally insufficient to go to the jury, that this was not a strong case. This was a case that relied essentially upon the testimony of one witness, the government's cooperator, along with the seizure of physical evidence and that there was very little else to support the government's case. It was therefore very important for the government to denigrate the defense that was put on, and there was a defense put on in this case. Mr. Cruz-Rivera testified about his own previous relationship with Segundo Gutierrez and that that relationship had nothing to do with drugs, that they had a completely different relationship and that he had a legitimate reason for seeing him, and he had a legitimate reason for having the money that he had with him. It was therefore very important for the government to cast him as a liar, and it did that not only by using some of the roadside statements that he made and attempting to compare and contrast those, but it also did that by essentially arguing facts that were not in evidence and making misleading, unfounded closing arguments that were made. I cite four instances in my brief, one of which has to do with saying that, and this was not in evidence, that Segundo Gutierrez had told Miguel Rivera to meet Cruz-Rivera at a Kmart mobile station. There was simply no evidence at all that, and this is in the transcripts, that Miguel Rivera was instructed to meet Ivan Cruz-Rivera at a Kmart mobile, and in fact the evidence was that Mr. Cruz-Rivera and Jimenez never went to a Kmart mobile at all. The misconduct was further aggravated by the government's mischaracterization of getting into a characterization of what this area was, which was some high drug area, which Segundo Gutierrez was not permitted to testify about, but that was one piece of sort of made-up evidence that was put in front of the jury, again to try to tie Cruz-Rivera to this drug world, which was the whole government's theory of the case. One of the other... I don't want to certainly tell you how to argue your case, but one thing I'm interested in is the district court's finding that there was probable cause when they were pulled over to arrest. Yes. Okay, well, of course, we argue that there was not probable cause at the time of the arrest. It's an interesting point because it actually, I believe, that finding is relevant to whether or not they're in custody, but to do the probable cause analysis, the court wants to hear our view on that. One of the things that distinguishes... It seemed to me that the court was focused on what was observed at the garage. So, I was trying to figure out what distinguished, what they observed about the automobile that these two gentlemen were in versus the other cars that were coming and going. And it seems to me that the focus was on the fact that it had a New Jersey plate and also that they were the only car that had interaction with the garage owner. And when I say interaction, I don't mean that there was testimony that they saw them interact. The interaction was that they saw him motioning and giving him directions into the parking area. So, was there any other interaction that was observed besides that? No, there was not, which is why we contend that this record does not support a finding that there was probable cause to stop and search and make an arrest. As the trial judge found, there really was nothing that distinguished the observations that were made by the surveillance team of what was going on with the Lexus that distinguished it from what was going on with any of the other cars that came and went from that lot. Excuse me, counsel, whether the district court judge in his ruling on a motion to suppress noted that the officers had seen motor vehicle violations. Yeah. And that provided a justification to stop the motor vehicle. Yes. Yes. Do you agree with that? We were challenging the legality of the stop itself or arguing that it was a pretextual stop. We didn't challenge below that there might have been a marked lane violation or something like that. But that changes the analysis of whether you can get into the car and make a search. In other words, there's a fork in the road here. I search the car to make an arrest and search at the inception and who cares about whether there's a motor vehicle violation or there's not. We contend that there was not in that the probable cause analysis in terms of justifying the stop at its inception really is unsustainable. And then the question is, is this treated as a routine traffic stop? It's clear that it was not a routine traffic stop. There may have been a reason to stop for a marked lane violation, but that's not why this car was stopped. And so then the question, you go down the, you know, the road. Sorry, under the case law, though, excuse me, isn't it permitted for a law enforcement officer to be told, you know, there's a problem with a possible problem with an individual, keep an eye on the car. Then there's a motor vehicle infraction, which justifies the stop. Then there's questioning of the occupants of the car. And that develops into a probable cause by based upon perceptions of the answers that are being given, the contradictory answers to questions. Well, yes, no, and I understand it's your job to ask me these hard questions and they are hard questions, but that changes certainly what we can call a traffic stop can ripen into something else. And I'm also not suggesting that Trooper D. Crescenzo had to erase what he had been told before he made the stop. But the fact of the matter is, if you're relying upon not a probable cause analysis, but relying upon what transpired at the roads in order to justify this escalating intrusion on the occupants of the car, what we would say is that the first eight minutes of this encounter between the stop and the clearing all shows that there was nothing wrong with these two men. That is, they had no outstanding warrants. The car was properly licensed. Nervousness is not enough. There are cases about that. I think McCoy is one of the cases here out of the circuit that says that being nervous is not enough to get you to the next level of intrusion. And so simply because they're, and the thing is, it's really important. You can't disentangle this from the fact that it was the motive of this officer to make a search of the car from the inception of the stop. And that was clearly found by the trial judge. And there's absolutely no reason to disagree with that based on the facts that came out of the testimony. This was going to be a car search, no matter what these people did. All right. Thank you. Are there other questions from the court at this time? I do not waive my other arguments, Your Honor. I hope I have a chance to address them in rebuttal. Yes, you've reserved some time. I appreciate it. Thank you. So if you would mute your audio and video at this time, Ms. Freed, and we'll hear from Ms. Drake. Mr. Drake. Ms. Drake. Yes, Your Honor. Good morning. May it please the court. My name is Jamesa Drake and I represent Carlos Jimenez. With the court's permission, I'd like to address my third assignment of error, which is the sentencing issue. This court, like other courts to consider the issue, has held that minimum mandatory sentences in 841B apply without regard to a defendant's knowledge of the quantity of the drugs in question. So I understand that I have my work cut out for me on this issue this morning. But I believe that the argument is worth pressing for three reasons. The first, this court's seminal decision in Collazo-Aponte was decided before Aileen and before the United States Supreme Court decided Flores-Figueroa, McFadden, Alonis, Reihoff, and the like. Secondly, appellate judges who've considered this issue after those decisions have splintered. We have Judge Meritz, a dissenting opinion in Dado, and we have the Ninth Circuit's decision in which five judges dissented. And third, our verdict slip is somewhat unique and I believe it illuminates the jury's thinking in this case. As I argue in the brief, I think the only logical reading of the verdict slip is that the jurors believed Mr. Jimenez constructively possessed the heroin when it was in a backpack in the backseat of his car, but that he didn't know how much heroin was inside of the bag. And so because of all of this, I ask this court to revisit its own case law, this court's recent unpublished decision in Romero notwithstanding. On the Meritz, the argument proceeds in three parts, I think. The first is that after Apprendi and Aileen, any fact that increases the mandatory minimum sentence constitutes an element of the offense and has to be submitted to the jury. So we know drug quantity is an element. And this conclusion is underscored by the fact that in this case, the jurors were asked to make a finding about drug quantity. The second is as both Judge Meritz and I think the entire Ninth Circuit recognized, after Apprendi and Aileen, the fact of drug possession in 841A and drug quantity in 841B are dependent conditions. Together, they establish a unified, a single unified offense. And then third, 841A contains the mens rea requirement, it contains knowingly. And that culpable mental state travels or attaches to or applies to each operative element, including the elements in 841B. Now, my third conclusion, I draw support from a variety of United States Supreme Court cases. First, Flores-Figueroa, where the court instructed that courts will ordinarily read a phrase in a criminal statute that introduces the elements of the offense with the word knowingly as applying to each element. Flores-Figueroa and Reihauf further instruct that there is a strong presumption that Congress intended to require a culpable mental state for every operative element of a crime. And Reihauf further instructs that that presumption is overridden by Congress only if Congress has made plain that it intends to forego a mens rea requirement, something that we don't have with regard to 841A or B. Also- Counsel, can I ask you a question? Is there any circuit which has, and I know there have been dissents such as the recent Ninth Circuit case from a few days ago, is there any circuit which holds as you're asking this court to hold regarding mens rea? No, Your Honor. And of course, we admit that freely. Not every circuit has weighed in, and circuits who have considered the question have done so as this court has in decisions that predate a lien. And what I'm really- Although, again, as you point out appropriately, the Romero case, which is an unpublished decision from just a few months ago, three active members of this court sat on it, took note of a lien, and determined that there was not a sound reason for believing that Collazo-Aponte panel would change its collective mind on mens rea. Yes, Your Honor. I see that. I read Romero sort of two ways. The one is that the court seemed frustrated with the advocacy on the issue that it received, separate and apart from the merits. But secondly, with regard to the merits, the Romero decision, and I hope that this is a fair reading of it, seemed to suggest that, it seemed dismissive of the argument, the notion that the argument was put together by cobbling various sentences from various Supreme Court decisions. I submit that the Ninth Circuit's decision to reconsider the issue and to do so en banc militates strongly in favor against that view, that this is a serious issue that is worthy of reexamination in light of Ryhoff. What I believe the Supreme Court has been trying to communicate through a rapid succession of cases, which is that our criminal statutes deserve reexamination as it relates to a culpable mental state and the operative elements that a culpable mental state will apply to. And the US Supreme Court has acknowledged in its own decisions that the conclusions that it's reaching in favor of the application of a culpable mental state are going against lower court decisions that have been unanimous in the other direction, and that have been entrenched for decades. I believe that the Supreme Court is truly trying to communicate that this is an area of the law that deserves reexamination, and it is in that spirit that I pressed this argument this morning. Follow-up questions from the court? Just one. Is the Ninth Circuit's decision on appeal to the Supreme Court? Not yet. I don't believe so yet, but I anticipate that it will make it up that way, looking at the constellation of attorneys who were on the briefs in those cases. They are, some of them, US Supreme Court litigators, so I would expect to see that decision go up. Thank you, Ms. Drake. Thank you very much. And we'll hear from Mr. Knoll. Good morning, Your Honors. Andrew Knoll on behalf of the United States. I'd like to start, if I may, with the search and seizure and motion to suppression issue. The district court correctly denied the defendant's motions to suppress and held that it was probable cause for the stop and search of the defendant's Lexus as a product of the DEA and Massachusetts State Police 16-month heroin investigation and their direct observations on October 4, 2013. Judge Thompson, I want to address your question about the specific facts known to the officers. As you note, there were pertinent facts related to the out-of-state license plates of the car, as well as Gutierrez's direct interaction with the vehicle at the roadside, both coming and going from the garage. But I think there's additional facts that are worth emphasizing that were known to the officers, the first of which was that the officers had sent a cooperating source to the garage directly, mere minutes before the Lexus arrived. And during the recorded conversation, Gutierrez was recorded telling the cooperating source that he would he said, you'd have it in your hands by around 1.30. And then directly after the Lexus left the garage, there was a call from Rivera, who was the cooperating source's source, and who was the nephew or what Gutierrez colloquially referred to as his nephew, who told the source that the heroin was being mixed now and would soon be prepared. And that call was made before Sergeant Mackie directed that the vehicle be stopped. That testimony from both Mackie and Trooper Vitale was that that communication was made before he requested that the car be stopped. And I think those surrounding facts were also quite important to the government's contention that there was probable cause here to believe that that out-of-state Lexus had just delivered heroin, that Gutierrez was then mixing up. And that gave the officers cause to stop the vehicle. Mr. Knowles, what I don't know is what else was going on. I mean, if that was the only car that was arriving, then I can understand that. I just don't know. I mean, the record seems to suggest that there were other cars that were coming and going at around the same time. So I don't know if it's the fact that... If it's not the only car with a temporal connection, then the only thing that I have left are those two other factors, the license plates and directing. Well, Your Honor, there was testimony from Sergeant Mackie that the vehicle was the only one that Gutierrez was seen interacting with. And by that, I don't mean at the roadside, but I mean the only vehicle that he approached outside the garage and then went into the garage with the two men that had left the vehicle and was not seen reemerging from the garage over the course of the next two hours until it left and he gave it directions away. So I think that was an important fact to the officers that added additional heft to their probable cause determination. But I thought they couldn't see them enter the garage. I thought the only thing that they could visually observe was the directing and that they were out of sight when they actually entered the garage. So I believe, Your Honor, the testimony was that they couldn't see the very back of the driveway, but they could see Gutierrez exit the garage and proceed to go up and meet the individuals. And then after that point, it's unclear on the record, there were a number of which garage bay they entered. I think Gutierrez's testimony was they entered the front, but in any event, there was no sign of Gutierrez seen yet again throughout that period. And I don't think the probable cause standard, respectfully, Your Honor, requires the government to rule out other possibilities or other innocent explanations for the interaction between the Gutierrez and the individuals. I think it's sufficient that the officers... I'm just trying to figure out which singles this one out, though, from the other cars. Again, Your Honor, I think it's the direct interaction between Gutierrez. He was on the phone during the initial interaction in his garage with the cooperating source, appearing to give directions to a vehicle, a vehicle with out-of-state plates that had appeared lost, then appeared, that he went out to interact with. And again, the direct call from Rivera, who was the cooperating source's source to Gutierrez, right after the car left to say the heroin would soon be ready, I think surprised a very strong connection between that vehicle and the individuals. But even, Your Honor, even putting aside the collective knowledge known to the officers that were involved in the larger DEA investigation, as we know in our brief, we think alternatively the record clearly supports the finding that Trooper DeCresno himself individually had reasonable suspicion of both a traffic infraction as well as a drug trafficking crime that allowed him to stop the vehicle, and that that suspicion ripened over the course of the stop into probable cause to search the vehicle. And I want to be clear that there's a distinction in our view between the broader facts known to the government and the specific facts that Trooper Vital directly told to Trooper DeCresno during his conversation with him. And as my opposing counsel, Ms. Freed, just said, she's not asking this court to say that DeCresno had to wipe that information from his mind. And those facts were very pertinent to both the initial interaction between Trooper DeCresno and the two defendants in the vehicle, as well as the information Trooper DeCresno received once he did a check in his vehicle and learned that there had been a recent license plate pull by the Worcester Police Department that directly corroborated the information Trooper Vital had given about both the government's interest in this vehicle and its course of travel, and contradicted the defendant's statements that they had just been in Lawrence visiting family. And similarly, the information that the officer learned after returning to the vehicle, where Jimenez couldn't name his cousin or then his brother-in-law, who he was allegedly visiting in Lawrence, couldn't supply the name of the store that they had visited. And then the fact that there was a sum of money that Trooper Vital saw in plain view from outside the vehicle, that in his understanding, looked as if it had been packaged in a way consistent with drug trafficking money, and well exceeded the $1,000 that Cruz Rivera said that he had in the vehicle. I think all of those facts, both the kind of series of facts, allowed the officer to continue his investigation, and then the ultimate total of them supplied probable cause to search the vehicle. I'd also like to just briefly address the Miranda issues, and I want to make two defendant-specific points and then a broader point about the circumstances. As to the individual defendants, Cruz Rivera makes clear that his claim in his reply brief is that he was in custody because he could not leave the scene without the driver, Jimenez. But this court has made abundantly clear that whether one is free to leave is not the test under Miranda. The test is whether there has been a restriction on movement that rises to the level of a formal arrest. And this court has previously held that being free to leave, as one would probably not feel in any Terry stop, is not sufficient to find a Miranda violation. Similarly, Jimenez claims he was in custody by the time he was put in the back of Trooper DeCresno's vehicle, which again, they were on a public highway on the side of the road, and Trooper DeCresno testified he asked him to sit there for his safety. This court has also said that that isn't sufficient to show custody, but in any event, the only statement Jimenez made after that point was his purported consent, and the government submits that probable cause had developed by that point that the search was proper, even absent any consent. And as to the broader circumstances, the government respectfully submits that this court has identified as relevant to the question of whether an individual is in custody, ways in favor of finding that this interaction and encounter was non-custodial. The interaction took place in the daylight on a public highway. There was a single officer involved in the questioning, although with a second briefly involved for translation over the phone. There were no restraints or other restrictions placed on the individuals, and the questioning itself lasted only within the first 38 minutes of the stop, and Trooper DeCresno specifically testified that the questioning of each individual was only a couple of minutes in each case after he left his vehicle. And then Mr. Knoll, did the district court make findings, make the findings that you're just presenting to this court? So, Your Honor, I think if you read the district court's recitation of facts, it largely tracks the government's, the facts that I just laid out. But even if there aren't express findings, this court has held, I can cite to you the Arnott case and also United States v. McCarthy, that where there's no express findings, this court must view the record and the reasonable inferences in the light most favorable to the suppression ruling. And so, even in the absence of any express finding to that effect, I think the fact that the court to view the facts in this light. And most of the facts, Your Honor, were undisputed at trial. There was a dispute about how Trooper DeCresno came to see the cash in the back of the vehicle, but the district court's recitation of those facts exactly tracks the government's testimony. So I think there's enough to suggest that the court made at least implicit findings. And if not, this court should view the record in the light most favorable to the court's ultimate ruling. With respect to the closing arguments, I just want to briefly say that I think the prosecutor's statements were all directly supported by the record evidence. And at most, there was some dispute in the record about certain portions of those facts, but it certainly wasn't misconduct for the government to urge the jury to accept the government's statement of the facts. In response to Cruz Rivera's claim about Gutierrez instructing Rivera to meet Cruz Rivera at the Kmart mobile, I just disagree that that wasn't in the record. I'll cite the court to Volume 7 of the appendix, page 86, where the government directly asked Gutierrez on the stand, who did you ask to meet Ivan Cruz Rivera at the mobile Kmart and lead him to the garage? And the answer was Megalito, which there was testimony that Megalito was his nickname for Rivera. That was directly in the record. And I cite a number of other instances in our brief where that fact was also elicited. So I just think it's incorrect that that wasn't before the jury. I'm happy to address other specific questions about the closing argument, but if there aren't any, I'd move on to briefly talk about the cross-examination of Gutierrez by Cruz Rivera, which I know opposing counsel didn't get to in her argument. I'll just say that the district court acted well within its discretion in limiting, in certain respects, that cross-examination. And in any event, those limitations did not rise to the level of a confrontation clause violation. Counsel confronted Gutierrez with his two plea agreements in the Massachusetts and Florida cases on multiple occasions throughout cross-examination. And she was able to elicit that he understood that the substantial assistance guidelines would allow him to receive a lower departure sentence if he gave a helpful testimony, that he assumed he would get a break if he helped the government, that he in fact gave a grand jury testimony against these very defendants as a result of his plea agreement in Florida. And then what I think is particularly important is the district court allowed, and the government didn't object to Cruz Rivera eliciting these specific sentences with guideline ranges, or at least as to Massachusetts, what Gutierrez's understanding of his guideline range was, as well as the mandatory minimum sentences to which he was subject. And that type of testimony goes far beyond the testimony that other courts have held does not provide a confrontation clause violation. So at page 51 of our brief, we cite to the district court's Luciano Moqueiro case where the court held that merely allowing the defendant to ask the cooperating witness about his understanding of his agreement and that he expected to receive a significant benefit, that was sufficient. It was not error for the district court to prevent any testimony about the specific exposure that the witness might have. And similarly, every other circuit that we cite there held that and kept out testimony about the specific guideline ranges or mandatory minimums. And here, Gutierrez testified directly that absent any substantial assistance, he had been sentenced to a 10-year mandatory minimum in Florida and had a five-year mandatory minimum he was subject to in Massachusetts and understood his guideline range to be between 70, 80, or 90 months. Mr. Noll, could you spend a minute on the 841 A and B question? Not so much law of the circuit and our being bound by prior panels, but the merits of it. If you have a conviction under 841 A simply for knowingly possessing with the intent to distribute, why wouldn't the mens rea requirement apply to the 841 B with respect to quantity? So I have three responses, Your Honor. First of all, the term So I think at a minimum, this court starts with a question about whether the term knowledge carries down from mere knowledge of possession of a controlled substance to the actual quantity or type of drug. Second, the presumption of scienter that cases like Alonis and Rahif have applied to new statutes, that has long been a presumption in the law that courts have applied in staples, excitement video, and cases going back decades. And the Supreme Court has made clear that presumption applies to differentiate between innocent conduct and criminal conduct. And I think all would agree that knowingly possessing a drug irrespective of its quantity is not an innocent act. So there's no need for that mens rea to carry down to 841 B to differentiate between innocent and criminal conduct. And if this court needs any further guidance, I think McFadden, the Supreme Court's case, which notably was decided post-Elaine, made clear that there is no need for the government to prove this precise substance that was possessed by an individual to sustain a conviction under 841 A. Of course, Elaine wasn't an issue there, but I think it's relevant that the court did not believe that the mens rea requirement traveled in a case that was decided post-Elaine when these Sixth Amendment concerns have been raised. And again, I'll just emphasize that as our, I think, 28-J letter to this court last week suggested, this court's longstanding case law is consistent with every criminal court of appeals and every court of appeals that have reconsidered the question since Elaine was decided. So I don't think Jimenez has provided any sound basis for this court to move away from its settled case law. With respect to the Ninth Circuit decision in Colosso, of course, you've read Judge Fletcher's dissent. What is your response to the dissent? My response, Your Honor, is I think the dissent in that case and also Judge Merritt's dissent that Jimenez cites, I think there's a confusion in those dissents between the statutory question of where mens rea lies and the Sixth Amendment question of regardless of what the elements are, who decides? And I think it's enough to say as a statutory matter that the statute requires the government to prove that the offense involved 100 grams of heroin here. And that's a finding the jury did in fact make. And that's separate from the question of who decides once those that the fact has been shown. And so we think that there's no question that the fact of the amount of quantity is a fact that the government has to show to sustain a conviction. And that because that's a fact that government has to show, it's a fact that the jury must find. Are you aware of any legislative attempts in response to the circuit court decisions to amend 841B so that aligns more with 841A and inserts a knowledge requirement? I'm not aware of any, Your Honor. And again, I would just stress that there's unanimous decision, at least majority decisions among all the circuits. So I don't think there's unsettled law. I don't think there's a need for Congress to step in at this point. I think the courts have thing to know if the issue is presented to Congress and what the path, the congressional path in response to perhaps an effort to change the statute was. That's why I ask. Right, Your Honor. I am just frankly not aware of any such efforts, unfortunately. Any further follow up from the panel? All right. Thank you, Mr. Noll. And Ms. Freed, you have reserved two minutes. Thank you very much. I would just like to know whether there are any specific questions that the court has for me before I turn to a couple of things that I didn't get a chance to address. All right. Thank you. I wanted to speak about the restriction on the court's restriction on the cross-examination of Segundo Gutierrez about his cooperation agreements and on the sentencing guidelines. One of the things that seemed to be animating the court was its desire, a strong desire to keep the guidelines, knowledge of the provisions of the guidelines from the jury. One of the reasons why I would submit that that kind of worry was not appropriate in this case was that it's pretty clear that Segundo Gutierrez's guidelines calculation, whatever it was, would not have been the same as what Ivan Cruz Rivera's guideline calculation was because they were not facing sentencing for the same crimes committed over the same period of time. In other words, Segundo Gutierrez was facing sentencing in the district court for a drug distribution on October 4th to the cooperating witness, but also was facing a conspiracy charge with Miguel Rivera that went back another year and a half, as well as a separate distribution count on September 5th when he sold drugs. So there wasn't an identity of the applicable guidelines from which the jury might be able to infer, oh, this is what the sentence is going to be. The other thing that I think is important in this discussion is that it was the government that put the contracts that they moved in, and then the court would not allow the defendant to explore what these contractual terms were. The contractual terms, the terms of references to 5k1 and to these other provisions that were laid out specifically in the plea agreements, that we would submit that these legal terms that were contained in the contract are proper subject for cross-examination, and that it was error for the court not to let the defense explore on cross-examination the provisions of this contract that the government drafted and put into evidence itself in order to either bolster or not the credibility of its own witness. How do you respond to the government's argument that even with the limitations, there was adequate impeachment by what was allowed and therefore any error was harmless? My response, Judge Thompson, is that it's not enough to allow the defendant to ask what the witness's understanding is of what he might get. That would be the bare minimum of what would be appropriate. What's important for the jury to is what the law, is what the penalty the witness is avoiding by providing the assistance to the government that it's providing. The witness's understanding of that may be completely inaccurate, and it almost certainly was in this case. Also, it's not necessarily the case that the witness is necessarily being honest about what his understanding is either. The objection that this was attorney-client-privileged information is simply untenable. It's clear that the government was not entitled to a certain attorney-client-privilege that the witness would have to assert, but it's also clear we would submit, even though it doesn't seem to be decided in this circuit, but it's been decided elsewhere, that once a person becomes a plea agreement with the government, they're no longer entitled to assert an attorney-client privilege. The government's post hoc attempt to justify this as some sort of a hearsay objection is simply, not only was this not hearsay, it's not supported by the record. If there are no further questions, we will take the case under advisement. Thank you. Thank you. Thank you very much. That concludes argument in this case. Attorney Freed, Attorney Drake, and Attorney Knoll, you should disconnect from the hearing at this time.